IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CURTIS JOHNSON, an individual,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>THE NEBRASKA METHODIST HOSPITAL,<br><br>　　　　　　　Defendant. | 8:15CV181<br><br>MEMORANDUM<br>AND ORDER |

　　　　This matter is before the Court on the Motion for Summary Judgment (Filing No. 32) submitted by the Defendant The Nebraska Methodist Hospital ("Nebraska Methodist"). For the reasons stated below, the motion will be granted.

**I.　BACKGROUND**

　　**A.　Plaintiff's Claims**

　　The Complaint sets forth the following claims:

1.　Nebraska Methodist discriminated against Plaintiff Curtis Johnson ("Johnson") on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-2;

2.　Nebraska Methodist discriminated against Johnson on the basis of race and color in violation of the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. § 48-1104;[1]

3.　Nebraska Methodist retaliated against Johnson in violation of the anti-retaliation provisions of Title VII, 42 U.S.C. § 2000e(3)(a);[2] and

---

[1]Johnson alleges in his Complaint that "Methodist's supervisors and managers treat him and sanction harassment of Mr. Johnson in direct contravention of federal and state employment statutes."

[2]NFEPA is patterned after Title VII and Nebraska courts have generally looked to federal decisions to analyze claims brought under that act. *See*, *e.g.*, *Leiting v. Goodyear Tire & Rubber Co.*, 117 F. Supp. 2d 950, 955 (D. Neb. 2000); *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999). Therefore, Johnson's claims of discrimination and retaliation under NFEPA will be analyzed jointly utilizing the federal standards.

    4.    Nebraska Methodist retaliated against Johnson in violation of the NFEPA, Neb. Rev. Stat. § 48-1114.

Johnson's claims can be boiled down to the following:

    1.    Race and color discrimination based upon unfair discipline and termination;

    2.    Race and color discrimination based upon three failed requests by Johnson to transfer to day-shift positions; and

    3.    Retaliation for having filed an internal grievance regarding failed requests for transfer.

Nebraska Methodist seeks summary judgment on each of these claims.

### B.    Uncontroverted Facts

Unless otherwise noted, the following facts were presented in the parties' briefs and supported by pinpoint citations to admissible evidence in the record. The parties have admitted these facts, or have not properly controverted them[3] as required by NECivR 56.1[4] and Fed. R. Civ. P. 56.

Nebraska Methodist is a non-profit corporation with its principal place of business in Omaha, Nebraska. Nebraska Methodist hired Johnson, a black male, on or about December 13, 2010, to work as a Security Officer primarily at Methodist Hospital, but also at Nebraska Methodist's Women's Hospital, and sometimes at Nebraska Methodist's College of Nursing. Johnson began working full time on the night shift on March 24, 2011, and continued in that capacity until November 8, 2013. On November 8, 2013, Johnson was transferred, at his request, to a shift working 6:00 a.m. to 2:30 p.m. three days a week and 2:00 p.m. to 10:30 p.m. two days a week.

---

[3] Johnson did not present the Court any separate Statement of Facts. While he did note that certain statements contained in Nebraska Methodist's Statement of Material Facts ("SMF") were "disputed," as Nebraska Methodist notes, in virtually all cases the citations provided by Johnson do not, on this record, support the assertion that the original SMFs were in fact disputed.

[4] Properly referenced material facts "are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1).

The written job description for the position of Security Officer at Nebraska Methodist required that Security Officers obtain clearance from the Nuclear Regulatory Commission ("NRC") to be able to work in Methodist Hospital—Johnson's main duty station.  In order to obtain such clearance, an employee must be continually found to be "trustworthy and reliable."  Security Officers are required by Nebraska Methodist to have this designation for a number of reasons, including the fact that they have access to secured data, systems, and equipment governed by or related to the NRC and the Nebraska Department of Health and Human Services.  Maintenance of this "trustworthy and reliable" designation is, according to the Job Description, a stated function of the job as a Security Officer.  Johnson admits knowing this clearance was necessary for his job.

Andrew Whiteing ("Whiteing"), a white male, directly supervised Johnson as the Team Leader until April 29, 2013.[5]   On or about April 29, 2013, another Team Leader, Jeffery Farmer ("Farmer"), a black male, became Johnson's direct supervisor.  Johnson's position included following the direction of the Lead Security Officer, Ron Ware ("Ware"), a black male.

In a performance evaluation Whiteing completed for Johnson dated March 21, 2013 (Employee Engagement Rating), Johnson received ratings of either "fair" or "good" on a scale of 1-4 (1 – "poor", 2 – "fair", 3 – "good", 4 – "very good").  Johnson does not dispute the fairness or accuracy of the March 21, 2013, evaluation.  On the same date of his evaluation, Johnson received a "Moving Organizational Performance Employee Conversation" which specifically addressed performance concerns, including Johnson being "slow to respond to calls to back up fellow officers," as well as failing to follow the uniform policy, failing to complete required reports, and other issues.  That document also informed Johnson of the need to respond to security calls in a more expeditious manner.  In addition, the document stated Johnson needed to improve his attitude and any

---

[5]Johnson described Whiteing as the supervisor with whom he liked working the best.  The parties disagree as to the date Whiteing first became Johnson's supervisor.  However, that starting date is not material to the issues raised in this motion.

further issues with patients or co-workers after March 21, 2013, would result in disciplinary action.

In the midst of these performance issues and counseling, Farmer offered Johnson additional training to attempt to improve his performance and to allow him to obtain a certification by the International Association of Healthcare Safety and Security. Farmer provided some books to Johnson relating to the course, but Johnson eventually declined that offer of training.

In or about October 2013, Johnson asked to be moved to the day shift. Linda Moore ("Moore"), a black female Team Lead Security Officer who had worked with Johnson, told the decision makers Johnson would not be a good fit for that position. Tom Pacura ("Pacura"), a white male, was moved to an open day shift rather than Johnson due to Moore having reported that Johnson lacked communication skills and seemed to lack motivation.

On December 27, 2013, Farmer issued a "Misconduct Documentation Form" which documented a discussion with Johnson in which he was counseled about telephoning a female employee in the Methodist Health System at her residence. The employee complained she never gave Johnson her name or phone number and she was concerned and frightened about the call. The Documentation Form warned Johnson he would face additional disciplinary action if another incident of that nature occurred.[6]

---

[6]Johnson argues that somehow this and other counseling documentation and performance appraisals are suspect given the more favorable employee evaluation Johnson received on December 13, 2013. That rating scale was a bit different than the Employee Engagement Rating which was given in March of 2013. While Johnson did receive the highest rating ("Role Model") in certain categories, he also received ratings of "Consistent" in other categories and received an overall rating of "Consistent." That evaluation also notes Johnson's job performance was "highly improved" as compared to his last performance evaluation. The mere fact that Johnson received a favorable evaluation based upon temporary improvement of prior performance issues does not change the fact that he had previous (and later) performance issues as noted herein.

4

In February of 2014, Johnson applied for another open day-shift position. In this instance, Christine King ("King"), a white female, was awarded the position.[7]

Johnson filed an internal grievance with Nebraska Methodist on or about February 25, 2014, challenging the decisions to award the day-shift positions to Pacura and King. Even though the grievance appeared to complain about the selection of Pacura, in the body of the written grievance, Johnson indicated that he was "fine with" the decision to hire Pacura because Pacura had more seniority than Johnson.

Susan Maheux ("Maheux"), Director of Employee Relations at Methodist Health Systems, investigated the grievance. Following the completion of the investigation, Maheux met with Johnson on March 7, 2014, and told him her investigation had found the decision to hire King was appropriate because Methodist would benefit from having a female Security Officer on the day shift.[8] For example, if a sexual assault victim was brought to the hospital during the day, a female Security Officer could be present. In addition, Maheux informed Johnson one of the reasons he was not chosen for the day-shift position was due to his ongoing performance issues.

Maheux then told Johnson that protocol was to send her findings to the Vice Presidents of Integrated Services and Human Resources at Nebraska Methodist as well as the President and Chief Executive Officer ("CEO") of Methodist Health System for review and that the CEO would then make a final decision. On March 11, 2014, Johnson informed Maheux that he did not want to continue the grievance.[9] Significantly, nowhere

---

[7] Johnson sought a third position on day shift in or about May of 2014. That position was awarded to Robert Martinez, a Hispanic male, and not to Johnson, again based on Johnson's ongoing performance issues. Johnson apparently did not grieve the decision.

[8] Johnson does not claim gender discrimination.

[9] While Johnson claims that this fact is "disputed," he testified only that he could not recall what, if anything, he had told Maheux. Maheux on the other hand specifically stated in her declaration that this conversation had occurred.

in the grievance (or any other communication) did Johnson raise any issues with regard to his race or color being a reason or, even a suspected reason for his non-selection.

On March 28, 2014, the Emergency Department informed security that a patient was missing—a "Code Adam" (possible child abduction). Ware instructed Johnson to respond immediately and attempt to find the patient. Ware concluded Johnson did not promptly respond to this Code Adam because Ware left the security office after Johnson but Ware actually arrived at the Emergency Department before Johnson. Ware later counseled Johnson that he had not responded quickly enough to the Code Adam.

Due to ongoing problems, in April of 2014, Ware offered to personally mentor Johnson. Johnson declined, ignoring Ware and walking out of the security control room. Johnson explained: "I . . . don't feel like I need any mentoring. I'm a grown man and I don't need no one holding my hand. I know my job." In April of 2014, Maheux also sent Johnson an e-mail communication listing specific areas of feedback and areas of possible performance improvement for Johnson.

On or about May 11, 2014, Ware called Johnson to respond to an incident in the visitors' parking lot staircase. Ware did not believe Johnson followed Ware's instructions which he felt caused the suspect to flee. A Nebraska Methodist Maintenance Mechanic later found the suspect hiding under a car in the parking lot.

Due to previous performance issues about which Johnson had been counseled, and due to the May 11, 2014, incident, Farmer and Matthew Shaw ("Shaw"), the Director of Public Safety, suspended Johnson's employment and placed him on a Performance Improvement Plan. The Misconduct Documentation Form generated at that time stated Johnson's actions "violate[d] the Security Officer Code of Ethics."

As a general practice, Nebraska Methodist's Human Resources Department ("Human Resources") conducted bi-weekly audits of all corrective actions of employees

6

who need to maintain necessary clearances, including NRC clearances. As a part of those audits, and based upon the most recent documentation, Human Resources decided Johnson did not meet the criteria for being trustworthy and reliable and suspended him.

Farmer and Shaw then told Johnson that Human Resources had revoked his NRC clearance and therefore he could not work as a Security Officer at Nebraska Methodist. As a result, Johnson's employment was terminated effective on or about May 19, 2014. Johnson did not internally complain about his suspension, the revocation of his clearance, or his termination from employment.

Farmer and Shaw also told Johnson he could not otherwise work in the security department because there were no openings at the time which did not require NRC clearance. They did inform Johnson they would try and locate other work for which he could apply in another area at Nebraska Methodist that did not require clearance. In addition, Human Resources encouraged Johnson to apply for other positions which did not require NRC clearance. Human Resources eventually determined no security positions were available which did not require clearance.

The evidence is uncontroverted that two other Security Officers at Nebraska Methodist, both white males, had their NRC certification revoked due to the fact that they had lost their "reliable and trustworthy" status. They were both terminated from employment as a result.

Johnson testified the only person at Nebraska Methodist who discriminated against him due to his race/color was Farmer.[10]

Johnson accuses Ware of misrepresenting Johnson's actions with respect to handling the suspect on May 11, 2014. While there may be a difference in perception of

---

[10]The disciplinary actions and performance appraisals which were the basis of the challenged decisions were administered by either other black employees or white employees to whom Johnson does not attribute discriminatory animus.

7

the situation,[11] the fact remains that Ware, who had problems with Johnson's responsiveness prior to the May 11, 2014, incident, perceived that Johnson failed to follow his orders.[12]

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[S]ummary judgment is not disfavored and is designed for every action."  *Briscoe v. County of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant."  *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue[,] . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing the "the absence of a genuine issue of material fact."  *Id.* at 325.  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating a genuine dispute of material fact "such that [his] claim

---

[11]Johnson points to the testimony of Raymond Prescher, a Maintenance Mechanic who apparently believed that it was Ware who caused the suspect to escape.  The fact is that Ware prepared a report placing the blame on Johnson, and that Farmer credited Ware's account of the incident.  Ware and Farmer are both black, and Johnson has failed to provide any evidence racial animus played any part in the report.

[12]Moreover, Ware was not a decision maker with respect to the suspension and eventual termination in this case.

should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042). "[T]he mere existence of some alleged factual dispute between the parties" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1042). Where the Court finds "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is required. *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

### B.   Race and Color Discrimination

Johnson argues Nebraska Methodist discriminated against him on the basis of race and color in violation of Title VII, 42 U.S.C. § 2000e *et seq.*  Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to [his] compensation, terms, conditions or privileges of employment because of such individual's" race or color. 42 U.S.C. § 2000e-2(a)(1). In discrimination claims based upon race or color, a plaintiff may establish a claim through direct[13] or indirect evidence. *Torgerson*, 643 F.3d at 1044. A plaintiff may survive a defendant's motion for summary judgment by producing direct or circumstantial evidence "'sufficient to support a finding

---

[13]There is no direct-evidence claim made here, nor is any "direct evidence" submitted.

9

by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Id.* (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)). When a plaintiff presents indirect evidence of discrimination as in this case, the Court analyzes the claim under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

Under the three-step analysis of *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Torgerson*, 643 F.3d at 1046. Once a prima facie case is established, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (quoting *Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009)). Finally, if the employer articulates such a reason, the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination. *Id.*

Federal courts do not sit as a "super-personnel department" questioning fairness of business judgments made by an employer unless those judgments involve intentional discrimination. *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007). "Although intermediate evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### 1. Johnson's Prima Facie Case – Failure to Transfer or Promote[14]

To establish a prima facie case of race or color discrimination based on a failure to transfer or promote, Johnson must show: "(1) that he belonged to a protected class, (2) that he met the minimum qualifications and applied for the position, (3) that despite his qualifications he was denied the position, and (4) that his employer promoted a person of similar qualifications who was not a member of the protected group." *McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1126 (8th Cir. 1998).

Johnson belongs to a protected class and met the minimum qualifications for the position at issue. It is also undisputed that Johnson was denied the position. Although it is not entirely clear Johnson was similarly situated in all relevant respects to the three employees who were awarded the position of day-shift Security Officer, those employees were not members of Johnson's protected group, and the Court will assume, for purposes of summary judgment, Johnson established a prima facie case with respect to his claim relating to the filling of the three (3) day-shift positions.

### 2. Johnson's Prima Facie Case – Suspension/Termination

With respect to the claims of discrimination based upon Johnson's suspension and termination, Johnson could establish the *McDonnell Douglas* prima facie case by showing (1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *Macklin v. FMC Transp., Inc.,* 815 F.3d 425, 427 (8th Cir. 2016). Nebraska Methodist disputes whether Johnson met his employer's legitimate expectations. And, while Johnson

---

[14] Based upon the evidence presented, the Security Officer day-shift position was identical to the position Johnson held—it was just on a different shift. *Cf. Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (explaining a purely lateral transfer does not constitute an adverse employment action and cannot be the basis of a race-discrimination claim). The Court has assumed, for purposes of this motion, that the day-shift position was either a promotion or otherwise would have resulted in material change in working conditions. *See*, *e.g.*, *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir. 2016).

11

suffered an adverse employment action (suspension and termination), it is not at all clear that the circumstances involved give rise to an inference of discrimination. For example, there is no admissible evidence that similarly situated employees outside of the protected class were treated differently. In fact, there is undisputed evidence that two white employees had their NRC clearance revoked and lost their jobs as a result. Nonetheless, the Court will again assume Johnson has established a prima facie discrimination case.

### 3. Nebraska Methodist's Legitimate Non-Discriminatory Reasons

A defendant's burden is then one of production, not persuasion; therefore, the determination that the defendant has met its burden "can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). A defendant's burden at this juncture is "'not onerous,' and can be satisfied by showing that plaintiff, even if qualified, was a poor fit, or another candidate was a better fit for the job." *Sallis v. Univ. of Minn.*, 322 F. Supp. 2d 999, 1006 (D. Minn. 2004) *aff'd*, 408 F.3d 470 (8th Cir. 2005). Identification of the "strengths that constitute the best qualified applicant" is best left to employers. *Duffy v. Wolle*, 123 F.3d 1026, 1038 (8th Cir. 1997), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043, 1059 app.

The Court finds Nebraska Methodist has articulated legitimate non-discriminatory reasons for the decisions it made. First, with respect to the suspension and termination, it is clear that, whether Johnson believes that it should be (or needs to be) a legitimate requirement for the job, Nebraska Methodist requires Security Officers working at Methodist Hospital to have NRC clearance. Therefore, Johnson losing that clearance gave Nebraska Methodist a legitimate non-discriminatory reason for suspending and eventually terminating Johnson.

While Johnson disagrees with some of the disciplinary and performance related decisions that were made with respect to his employment as a Security Officer, the fact is that those disciplinary actions and performance counseling did occur and formed the

12

basis for the challenged decisions in this case. And Johnson has not adduced any evidence racial animus "was a motivating factor" in any of Nebraska Methodist's decisions. 42 U.S.C. § 2000e-2(m).

Second, Nebraska Methodist articulated legitimate non-discriminatory reasons for its decisions to deny Johnson his request to move to day shift on three separate occasions. The first such opening went to Tom Pacura in October of 2013 based upon the fact that the decision maker felt Johnson lacked communication skills and seemed to lack motivation. In the body of his written grievance, Johnson stated that he was "fine with" the decision to hire Pacura because Pacura had more seniority.

The second open day-shift position was awarded to Christine King. Again, Nebraska Methodist articulated a legitimate non-discriminatory reason both related to Johnson's poor performance and King's better "fit" for the position, including the perceived need for a female Security Officer to be present if needed for emergency situations involving female patients.

The third day-shift position was awarded to Robert Martinez, a Hispanic male. That decision is also supported by legitimate non-discriminatory reasons, that is, Martinez's superior performance as compared to Johnson.

Based upon the foregoing, the Court finds Nebraska Methodist has articulated legitimate non-discriminatory reasons for the challenged decisions and actions.

### 4. Johnson's Proffered Evidence of Pretext

Once a defendant satisfies its burden to articulate a legitimate non-discriminatory reason for its decision, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253). "[E]vidence of pretext and discrimination is viewed

in light of the employer's justification." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

In his reply brief, Johnson quibbles over facts that are not material to this Court's determination of this summary judgment motion. Many of the decisions which form the basis of the counseling, disciplinary actions, and eventual suspension and termination of Johnson were made by black employees of Nebraska Methodist who worked with and supervised Johnson. And Johnson has not presented any evidence his race or color played any part in the challenged decisions. While Johnson may disagree with the evaluations[15] and disciplinary action taken, none of those arguments rise to the level of establishing pretext.

For example, Johnson claims that Ware's rendition of the facts with regard to the situation with the suspect on the loose in the hospital were untrue. Whether those facts were ultimately true is not dispositive here. What is dispositive is that Ware, who is black, believed Johnson (as he had in the past) had not responded to a situation with the speed and zeal he should have. Moreover, the decision to remove the NRC clearance was made by Human Resources based upon its review of that disciplinary action and Johnson's ongoing performance issues.

Based upon a review of the evidence properly submitted by the parties, the Court finds, even viewing the admissible and properly presented evidence in the light most favorable to Johnson, that Johnson has failed to meet his burden of proof with respect to pretext. Johnson simply fails to provide any evidence the adverse employment actions he experienced were racially motivated or that Nebraska Methodist's reasons for taking those actions were pretext for unlawful discrimination.

---

[15]In fact, Johnson agreed with the March 21, 2013, evaluation which only rated him as "fair" to "good."

14

Johnson argues that he has shown pretext because of the "changing reasons for Johnson's failure to secure the transfers." The Court's review of the evidence, however, does not support Johnson's position that the reasons given have changed. For example, stating that King was a "better fit" is not inconsistent with the statement that "her verbal skills were better than Johnson's" or that Nebraska Methodist felt it needed a female on day shift. Rather, those are the reasons for the articulated "better fit."

In support of his claim of pretext, Johnson also points to instances which are not relevant to this issue. For example, he alleges there were "incidents involving race." Johnson claims that Pacura, a white Security Officer, used the "N" word. However, Johnson does not allege Pacura ever had supervisory authority, much less that he had any role in making the relevant decisions. Johnson never heard Pacura make that statement nor did he report that Pacura made the statement. Johnson admits he knows nothing about whether that incident actually occurred or whether, if it did occur, any action was taken against Pacura. In fact, Johnson did not hear of that circumstance until after he had been terminated. Moreover, this alleged event occurred after Pacura had been selected for the day-shift position that Johnson sought. Hearsay evidence regarding the alleged use of the "N" word which was not directed at or heard by Johnson, does not provide competent evidence of pretext in this circumstance. *See* Fed. R. Civ. P. 56(c).

Johnson also seeks to raise allegations of preferential treatment regarding another employee at Nebraska Methodist. Again, Johnson has no personal knowledge or admissible evidence relating to this alleged preferential treatment and therefore such recitation by Johnson does not provide evidence of pretext.[16]

---

[16]The evidence submitted by Johnson also establishes that this situation, if true, happened in a different location and involved different supervisors.

15

### C. Retaliation

In addition to his discrimination claims, Johnson claims Nebraska Methodist retaliated against him in violation of Title VII's anti-retaliation provisions, 42 U.S.C. § 2000(e)(3)(a). To establish a retaliation claim, Johnson must show (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action. *Hutton v. Maynard,* 812 F.3d 679, 684-85 (8th Cir. 2016).

Here, the inquiry is straight forward. Johnson has presented no evidence that he engaged in any statutorily protected activity. At most, he complained, in an internal grievance proceeding, about the fact that he did not receive the day-shift position which was awarded to Christine King. Johnson admits however that his grievance did not raise the issue of his race, color, or any other protected category being the basis for the challenged decision. *See Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999). Because Johnson failed to establish a prima facie case of retaliation, that claim is dismissed.

### III. CONCLUSION

Johnson has failed to provide sufficient evidence that his race and color were factors in the decisions not to transfer him to a day-shift position, or that race and color were factors in the decision to suspend and terminate him. Rather, Johnson had a number of performance issues which Nebraska Methodist tried to remedy through counseling, performance-improvement plans, and rejected offers of training and mentoring. Johnson eventually lost his NRC clearance necessary for his job, and no other jobs were available.

Moreover, Johnson did not engage in the protected activity necessary to support a claim for retaliation.

Viewing the facts in the light most favorable to Johnson, no genuine disputes of material fact remain for trial, and judgment as a matter of law will be entered in favor of Nebraska Methodist. Accordingly,

IT IS ORDERED:

1. Nebraska Methodist's Motion for Summary Judgment (Filing No. 32) is GRANTED as to all claims.
2. The above-captioned action will be dismissed with prejudice.
3. A separate judgment will follow.

Dated this 4th day of August, 2016.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge